IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 7, 2015

## STATE OF TENNESSEE v. TAVARUS DETTERIO GRIFFIN

**Appeal from the Circuit Court for Hardeman County**
**No. 08-01-0612      J. Weber McCraw, Judge**

_____

**No. W2014-02114-CCA-R3-CD – Filed December 3, 2015**

_____

Following a jury trial, the Defendant, Tavarus Detterio Griffin, was convicted of two counts of aggravated robbery and two counts of aggravated kidnapping. In this appeal as of right, the Defendant contends that: (1) the evidence is insufficient to support his convictions; (2) the entire jury pool was tainted when, during voir dire, a juror mentioned that she had been called for jury service at the Defendant's first trial on these charges; (3) the jury foreman's comment, prior to the beginning of deliberations, that he knew the Defendant was guilty constituted juror misconduct; and (4) the prosecutor's use of testimony from the Defendant's allocution at his first trial to impeach him with a prior inconsistent statement constituted reversible error. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

George D. Norton, Jr. (at trial and on appeal); and Keisha Richardson (at trial), Selmer, Tennessee, for the appellant, Tavarus Detterio Griffin.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Mike Dunavant, District Attorney General; and Joe Van Dyke, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### PROCEDURAL BACKGROUND

This case comes before us with a complex procedural history. The Defendant was originally indicted for two counts of aggravated robbery and two counts of aggravated

kidnapping in 2008. Following a jury trial, the Defendant was convicted as charged, and judgments of conviction were entered on October 2, 2008. The Defendant filed an untimely motion for new trial on January 30, 2009, and later, an untimely notice of appeal on May 12, 2009.

On May 9, 2011, this court dismissed the Defendant's direct appeal. See State v. Tavarus Detterio Griffin, No. W2009-01000-CCA-R3-CD, 2011 WL 1770727, at *1 (Tenn. Crim. App. May 9, 2011). On appeal, the Defendant had argued that his due process rights were violated when he was forced to appear before the jury in jail clothing, leg irons, and handcuffs. He also alleged ineffective assistance of trial counsel. A panel of this court determined that the Defendant's issues were waived because he had failed to include them in a timely motion for new trial. Id.

On February 1, 2012, the Defendant filed a petition for post-conviction relief wherein he asserted that he received ineffective assistance of trial and appellate counsel. On September 6, 2012, the post-conviction court granted the petition, finding that the Defendant's due process rights had been violated when he was forced to appear before the jury in jail clothing and restrained by leg irons and handcuffs. The post-conviction court concluded that counsel was ineffective for filing an untimely motion for new trial, resulting in waiver of the issue on direct appeal. The post-conviction court's order directed the Defendant to either pursue a delayed appeal or to file a motion for new trial.

On October 5, 2012, the Defendant filed a motion for new trial, which was granted on January 14, 2013. The Defendant's second trial began on January 16, 2014.

FACTUAL BACKGROUND

Tavarski Beauregard testified that on October 7, 2007, he participated in a home invasion at the house of Mike and Janet Hill and was accompanied by two acquaintances, Chris Tosh and the Defendant. According to Mr. Beauregard, he drove the Defendant and Mr. Tosh to the Hills' home in Mr. Tosh's girlfriend's car. Mr. Beauregard parked the car in a church parking lot that was adjacent to the Hills' home. Upon arrival, the Defendant and Mr. Tosh exited the vehicle, and Mr. Beauregard remained in the car.

Mr. Beauregard stated that the Defendant and Mr. Tosh were wearing "dark hoodies and jeans" and that they had "pulled the string" on the hoodies to obscure their faces. Mr. Tosh carried a revolver, and the Defendant had a 9 millimeter gun. Eventually, the Defendant and Mr. Tosh returned to the car. Mr. Beauregard could not remember whether they had any items with them upon their return. The men did not tell Mr. Beauregard what had happened in the house but simply said, "[L]et's go." Mr.

Beauregard then drove back to Bolivar, where the men separated. Mr. Beauregard testified that he did not receive any compensation for his role in the robbery.

The day after the robbery, Mr. Beauregard was "picked up" by Investigator Steaven Joy. Mr. Beauregard gave a statement to Inv. Joy and was eventually indicted on the same charges as the Defendant. In exchange for his guilty pleas, the charges against Mr. Beauregard were reduced to facilitation of aggravated robbery and kidnapping. Mr. Beauregard denied lying in his statement to police in order to "get a better deal" and stated that he told the truth.

On cross-examination, Mr. Beauregard admitted that he served less than a year as a result of his convictions in this case. Mr. Beauregard also admitted that he had been on probation in another case at the time these crimes were committed. However, despite the violation, his probation was not revoked, and he was not ordered to serve the remainder of that sentence in custody.

Mr. Beauregard testified that, after the robbery, Inv. Joy picked him up at a friend's house, and on the ride to the police station, Inv. Joy explained that he was being brought in for questioning regarding the robbery at the Hills' home. According to Mr. Beauregard, at the time he gave his statement to Inv. Joy, he knew that Inv. Joy was a police officer but had never spoken with him before. Mr. Beauregard denied that he was concerned about his probation being revoked at the time he gave his statement. Mr. Beauregard identified the statement he made and acknowledged that Inv. Joy had typed it. Mr. Beauregard testified that, although he admitted to his participation in the crimes, he was not arrested on the day he gave his statement but instead was released and allowed to go home.

Mr. Beauregard testified that the document typed by Inv. Joy was an accurate reflection of his statement and that he would not have signed it if there had been an error. Mr. Beauregard then acknowledged that in his statement, he told Inv. Joy that the Defendant was wearing a "black thermal" and that Mr. Tosh "had on a hoodie." Mr. Beauregard reiterated that both men were wearing hoodies, and he surmised that there could have been a typographical error in the statement. Although he recalled that both the Defendant and Mr. Tosh were wearing dark hoodies, he could not recall the exact color of the hoodies.

Mr. Beauregard could not recall when he "got in the car" on the night in question, how long he had been in the car, or whether anyone else had driven the car that day. He testified that he drove the car from Bolivar "[d]own 64" and towards the Hills' home. He also could not recall where he was when he began driving the car, how long it took to reach the church parking lot near the Hills' home, or how long he waited in the car while

the Defendant and Mr. Tosh were inside the house. Mr. Beauregard testified that after the Defendant and Mr. Tosh returned to the car, they drove back towards Bolivar. Eventually, Mr. Beauregard stopped and got out of the car on the "East End" of town. He testified that he got out of the driver's seat, and the Defendant and Mr. Tosh drove away. Although he could not recall exactly where he was dropped off, Mr. Beauregard testified that he walked approximately one mile to his girlfriend's house.

Mr. Beauregard described Mr. Tosh as a "[l]ight[-]skinned" black man, and he testified that, comparatively, Mr. Tosh's complexion was lighter than the Defendant's. Mr. Beauregard testified that he was five feet, seven inches tall and that Mr. Tosh was taller than him. Mr. Beauregard testified that he did not see either man with a rifle or money that night after the robbery.

On re-direct examination, Mr. Beauregard testified that, although he only served 300 days in jail for his involvement in the robbery of the Hills' home, the sentence imposed was four and a half years. Mr. Beauregard testified that his memory of the details of the robbery of the Hills' home was hampered by the fact that six years had passed since the incident. Mr. Beauregard agreed that, in his statement to Inv. Joy, he said that "they" pulled the strings on their hoodies, indicating both Mr. Tosh and the Defendant. Additionally, Mr. Beauregard testified that he was not looking in the back seat when the men came back to the car and, thus, really did not see whether they had any items with them from the house or put anything in the back of the car. After Mr. Beauregard was dropped off, Mr. Tosh got into the driver's seat of the car and drove away.

Inv. Joy testified that he was a criminal investigator with the Hardeman County Sheriff's Department ("HCSD"). On the morning of October 7, 2007, he received a phone call regarding a 911 call "that came through dispatch of a home invasion." The home invasion occurred in Hardeman County at the home of Mike and Janet Hill.

Inv. Joy testified that when he arrived at the scene, Deputy Jeff Hill[1] of the HCSD was already at the scene. After arriving, Inv. Joy first noticed "how disturbed the homeowners were." Inv. Joy did a "walk-through" of the house and began gathering information from Deputy Hill and the homeowners. Inv. Joy testified that, based on his investigation, he was able to piece together the following information. Mr. Hill had pulled up to the side entrance of the home on the night in question, and when he was exiting his truck, two males came from the east side of the house with guns and forced him inside the house. Once inside the home, the two men began asking about the location of a safe and stated, "We know you got money." Mrs. Hill, who had been asleep

---

[1] Deputy Hill is of no apparent relation to the victims, Mike and Janet Hill.

on the couch, awoke and walked with the men and her husband to the master bedroom, located at the back of the house. The men threatened to kill the Hills if they did not give them the money in the safe. Mrs. Hill was initially unable to remember the combination to the safe, but she eventually opened it. The men took the contents of the safe. At some point, a gunfight ensued in the middle of the hallway leading to the master bedroom between one of the suspects and Mr. Hill. Inv. Joy found one bullet hole in the wall and another which had ricocheted and gone "down the hall and . . . through the bedrail" before landing in the wall near the safe. He testified that this latter bullet hole came from a 9 millimeter gun. According to Inv. Joy, the Hills were unable to identify the suspects, but they did describe them as a tall, black male, and a short light-skinned black male.

Inv. Joy testified that he was able to develop Mr. Beauregard as a suspect through "phone calls . . . [and] [p]eople just talking." In particular, Inv. Joy said that he received an "anonymous call that just said [Mr. Beauregard] had something to do with it." Inv. Joy located Mr. Beauregard and took him to the jail to interview him. He did not place Mr. Beauregard under arrest at that time. Mr. Beauregard gave his statement on October 8, 2007. Inv. Joy denied making any offers of leniency to Mr. Beauregard at the time he took his statement. Mr. Beauregard implicated Mr. Tosh and the Defendant in the home invasion. According to Inv. Joy, Mr. Beauregard was arrested two or three days after giving his statement, and the Defendant was also arrested within a few days. Mr. Tosh was never arrested because Inv. Joy was unable to corroborate Mr. Beauregard's allegations that Mr. Tosh was involved, and there was not "sufficient evidence" to charge him.

The Defendant was arrested after a traffic stop, and his vehicle was searched. Officers found "a wad of money" under the driver's seat, which included $2-bills. In total, the sum of money taken from the Defendant's car totaled around $900. Police also searched the Defendant's girlfriend's apartment with her consent, and they recovered a "regular zippered hoodie, [with] drawstrings going through the hood, long-sleeved, [and] pockets on the left and the right side." Inv. Joy showed the hoodie to Mrs. Hill, who identified it as "the [one] that the short light[-skinned] [suspect] was wearing."

Inv. Joy testified that Mr. Beauregard's statement was corroborated by his investigation of the crime scene in the following ways: the pulling of the hoodies' drawstrings to obscure the suspects' faces; the caliber of the weapons used; and the 2:00 a.m. time frame. According to Inv. Joy, none of these facts had been made public and could only have been known by someone involved in the crime.

Inv. Joy next explained the method he used to put together a photographic array for identification of the suspects. He identified the photo lineup created in this case, which was printed in black and white and contained pictures of six individuals. Inv. Joy

acknowledged that the quality of the photographs was "poor," and he noted that the picture of the Defendant made his complexion appear much darker than it actually was.

After Mr. Beauregard and the Defendant had been arrested, their pictures appeared in the local newspaper, with a caption indicating that suspects in the Hills' robbery had been identified. After the story ran, Inv. Joy received a phone call from Mr. Hill who told Inv. Joy, "That's the one. That's the one had [sic] the gun on us. That's the one." Inv. Joy clarified that there were two pictures—one of Mr. Beauregard and one of the Defendant—and that Mr. Hill identified the Defendant as one of his assailants and not Mr. Beauregard.

Inv. Joy took a statement from the Defendant, who told him that he had previously owned a 9 millimeter gun but that he had sold it three to four days prior to his arrest. He denied having any knowledge of the robbery of the Hills' home, and he initially told Inv. Joy that he got the $2 bills from Mr. Beauregard. However, later in his statement, the Defendant told Inv. Joy that he had lied about where he got the money "because he figured that [Mr. Beauregard] had told something on him." With respect to an alibi for the night of the crime, the Defendant told Inv. Joy that he had visited a woman in Savannah, Tennessee. However, the Defendant did not provide Inv. Joy with a phone number or address for the woman, and Inv. Joy was thus unable to check the validity of the alibi.

On cross-examination, Inv. Joy testified regarding a statement he took from Mrs. Hill on October 12, 2007. Although the statement was otherwise detailed, Inv. Joy acknowledged that the statement did not reflect that Mrs. Hill had identified the perpetrators as black males. Nonetheless, Inv. Joy testified that Mrs. Hill did tell him that the men were black, although he could not recall when she told him that. He testified that he included black males in the photographic array based on Mrs. Hill's description of the intruders. Inv. Joy acknowledged that, in the photographic array, the picture of the Defendant was darker than the pictures of the other individuals. He claimed that it was darker because "[t]hat's the way the computer printed it out." He testified that the Defendant's photo was taken from a previous booking photograph. Inv. Joy testified that a new photo of the Defendant was taken subsequent to his arrest in the instant case and that the Defendant's hair was different in the newer photo. Also, he had facial hair in the older photo, but not in the newer photo. He agreed that the two photos looked very different, but he explained that this was not unusual because often times the photograph that police have of a subject will be from an arrest several years earlier. Accordingly, the most recent photo available on file may not be a recent photograph at all.

Inv. Joy agreed that Deputy Hill's statement reflected that Mrs. Hill identified at least one of her assailants as a white male. Inv. Joy stated that he did not discuss any

discrepancies in the account of the assailants' race with Deputy Hill. Rather, he relied upon what the victims told him directly, which was that the suspects were both black males.

Inv. Joy agreed that Mr. Beauregard told him that the Defendant was wearing a black thermal on the night of the robbery and that the Hills told him that both intruders were wearing hoodies. Inv. Joy also agreed that Mr. Beauregard did not mention a revolver when he gave his statement. According to Inv. Joy, he "wrote down everything that [Mr. Beauregard] told [him] from the night of the interview," and he believed the statement was true and accurate.

On redirect examination, Inv. Joy testified that the victims only identified the perpetrators as black males, and they identified the Defendant as "the light[-]skinned, short one."

Janet Hill testified that she was home on the night of October 7, 2007, lying on the couch in her home's living room. Mrs. Hill had seen the lights of her husband's truck reflect off the living room wall, and shortly thereafter, the couple's dog began barking. She suspected that her husband was "picking at the dog." She went to the door to investigate further, and when she opened the door, her husband was standing with two men who were carrying guns. She described the men as black males who were wearing "hoodies" or "jogging suits." She testified that both men "had the string [of the hoodies] tied kind of under their nose."

The men "kind of pushed" Mr. Hill into the home and "started asking where the safe was." Mr. Hill told the men that the safe was in the master bedroom. One of the men kept a gun pointed at Mrs. Hill, and the other pointed his gun at her husband. The men then "kind of guided [Mr. and Mrs. Hill] through [their] house." During this time, the men repeatedly threatened that they were going to kill the Hills after robbing them.

When they arrived at the master bedroom, Mrs. Hill attempted to open the safe while the assailants kept guns trained on both her and her husband's heads. After three or four attempts, she was finally able to open the safe. After retrieving the money from the safe, the men said that "they knew there was some more money in the house." According to Mrs. Hill, the Defendant told the taller assailant to kill Mr. Hill so that Mrs. Hill would tell them where the remaining money was.

The Defendant then led Mr. and Mrs. Hill into the master bathroom and held a gun to them. The taller man left the room but came back shortly thereafter and asked Mrs. Hill where her purse was located. The Defendant led the Hills out of the bathroom and into the bedroom of their deceased son. After looking through the room, the Defendant

-7-

escorted them out of the bedroom. Mrs. Hill testified that she left the room first, followed by her husband, and then the Defendant. Mrs. Hill "heard a scuffle" behind her and ran to the main bathroom located in the hallway. She heard running and then gunshots, but she remained in the bathroom. After a few seconds, there was silence, and she decided to leave the bathroom. She walked through the house but did not see anyone, and she called 911. She later learned that her husband had chased the men outside.

Mrs. Hill testified that Inv. Joy showed her a photographic array but that she was unable to positively identify anyone from that lineup. However, Mrs. Hill was later able to identify the Defendant "in the courtroom when he was with some other inmates."[2] She said that, prior to the identification, she had described the Defendant as the "smaller" and "light[-]skinned" assailant. According to Mrs. Hill, the Defendant did not appear light-skinned in the photo array presented by Inv. Joy. She stated that in the courtroom, she "could see the—more of the skin color." She testified that there was no doubt in her mind that the Defendant was one of the men who robbed her and her husband. She agreed that the Defendant's sweatshirt, which had been entered into evidence, matched the type of clothing worn by both assailants.

On cross-examination, Mrs. Hill denied ever telling the investigating officers that the assailants were white males. Rather, she consistently described them as "two black males, one was real whitish[-]skinned or lighter[-]skinned." Mrs. Hill recalled that a color photograph of the Defendant appeared in the local newspaper on October 24, 2007, and from that photo she was able to identify the Defendant as one of the men who robbed her.

Mrs. Hill was hesitant to testify about the length of time the men were in her home, but she estimated it was around thirty minutes. She testified that the Defendant was with her the entire time, and she was able to see his eyes, nose, mouth, eyebrows, and cheekbones.

Mr. Hill testified that he was working at a bar, Mikey's Place, on October 6, 2007.[3] Mr. Hill left the bar around 1:50 a.m. on October 7 and went straight home, arriving just before 2:00 a.m. He could hear the dog barking when he pulled up, and when he got out of his truck he "had a gun stuck to [his] head and one stuck to [his] side." There were two men, and they threatened to kill Mr. Hill and demanded he "give them all the money and stuff [he] had in his pockets." Mr. Hill estimated that he gave the men between one and two hundred dollars. According to Mr. Hill, the dog was still

---

[2] It is unclear at what time or under what circumstances Mrs. Hill had previously seen and identified the Defendant in the courtroom.

[3] Mr. Hill was deceased at the time of the second trial. His testimony given at the first trial was read into the record by Billy Davis, the Chief Deputy of Hardeman County.

barking, and his wife came to the back door to see what was going on. The men forced both Hills into the house and began asking where the safe was.

Mr. and Mrs. Hill led the men to their bedroom, where the safe was located, and Mrs. Hill attempted to open the safe. Mr. Hill testified that his wife was "so nervous, she couldn't get [the safe] open," and one of the men "put the gun to the back of her head, looked at his watch, and said, 'You've got [sixty] seconds left. If the door – If this door on the safe [i]sn't open, we're going to blow your brains out.'" After several attempts, she finally got the safe open. The men took everything out of the safe and threw it onto the bed. After taking all the money out of the safe, the Defendant pushed Mr. Hill into the bathroom, put the gun to the back of his head, and said that he "may go ahead and kill [Mr. Hill] so [Mrs. Hill will] tell [them] where the rest of the money is at." Mrs. Hill told the men that she had more money in her purse, and "the other guy" said, "Don't kill him yet." Mr. Hill testified that he was uncertain of the identity of the second assailant.

Mr. Hill testified that, at the time of the home invasion, he had never seen the Defendant before. However, at trial, he was certain that the Defendant was one of the men in his home that night. Mr. Hill explained that he was able to identify the Defendant and not the second man because the Defendant was "the one that kept the gun on [them] all the time and kept on saying he [was] fixing [sic] to kill [them]." According to Mr. Hill, the unidentified intruder was "mainly running through the drawers . . . and the rest of the house," unlike the Defendant who stayed with them "the whole time."

Mr. Hill testified that he always carried "a little .22 Revolver in [his] pocket" and that he was able to keep the gun on his person without either man detecting it. When the Defendant led Mr. and Mrs. Hill out of their son's bedroom and back into the hallway, the Defendant lowered his gun slightly. Mr. Hill grabbed the Defendant's gun, "tried to push it to the floor and get [his] wife out of the way[,] . . . and g[o]t [his] gun out of [his] pocket." Mr. Hill and the Defendant "got to scuffling[,] and [Mr. Hill] sort of pushed [the Defendant] down . . . ." The Defendant and Mr. Hill each fired a shot, and then the Defendant and the second intruder fled the house.

Mr. Hill agreed that he was "familiar with guns," and he stated that the Defendant was carrying a 9 millimeter automatic handgun and that the second man carried a .22 revolver. When asked to estimate how long the invasion lasted, Mr. Hill responded that, at first, he thought it was only about fifteen minutes but that he later "[saw] the time in the paper and [he] realized it was longer, about [thirty] minutes or so or longer." Mr. Hill said that, in total, the men took around $4,000, a .38 "Special," a "Torres" .22, a rifle, and "a bunch of $2.00[-]bills."

On cross-examination, Mr. Hill testified that he was unable to see the second intruder's face well because that man "tried to keep [the Hills] away from him," telling them repeatedly to "keep on looking at the floor." However, he did notice that the second assailant was also "light[-]skinned" and slightly taller than the Defendant.

Mr. Hill said that when he saw the picture of the Defendant in the newspaper, he was able to immediately identify him. He reiterated that he did not recognize Mr. Beauregard, although the newspaper also labeled him as a suspect in the robbery.

The Defendant testified and denied that he participated in the robbery and kidnapping of the Hills. The Defendant remembered that he was brought in for questioning by Inv. Joy in 2007. The Defendant understood that he was not required to talk to Inv. Joy, but he chose to speak with him and told Inv. Joy that he was not a participant in the Hills' robbery. According to the Defendant, Inv. Joy told the Defendant that he had spoken with Mr. Beauregard, who had divulged the Defendant's involvement in the robbery.

Inv. Joy questioned the Defendant regarding the $2-bills that he had in his possession when he was arrested. The Defendant admitted that he initially lied to Inv. Joy and told him that he got the $2-bills from Mr. Beauregard. He explained that he lied because he "just felt like [Mr. Beauregard] had said something to try to involve [him]." However, the Defendant admitted that, later in their conversation, he "changed his story" because he "wanted to tell the truth"; therefore, he told Inv. Joy that he had actually gotten the $2-bills from his grandmother. The Defendant denied that the money recovered from his car was under the seat, instead asserting that the money was in his wallet in the car's middle console. The Defendant testified that the $2-bills were in "another slot" in his wallet, separate from the rest of his money.

The Defendant acknowledged that the blue hoodie recovered from his girlfriend's apartment belonged to him, but he denied wearing it on the day of the robbery. Rather, he testified that he was wearing "a white T-shirt and some shorts" on that date.

The Defendant was "one[-]hundred[-]percent" sure that he was not with Mr. Beauregard on the night the Hills were robbed. He claimed that, although he had a girlfriend at the time, he was actually with a woman named Sharday in Savannah, Tennessee on the night of the home invasion. According to the Defendant, he was unable to provide Inv. Joy with Sharday's phone number because he did not have the number memorized, and Inv. Joy was in possession of his phone. He testified that, to his knowledge, Inv. Joy never followed up on his alibi. The Defendant told Inv. Joy that he had recently sold several guns, including a 9 millimeter. He testified that buying and selling guns was something he did regularly.

On cross-examination, the Defendant testified that the $900 he had at the time of his arrest was won gambling. The Defendant said that when Inv. Joy was interrogating him, his cell phone was on the table. The Defendant did not tell Inv. Joy that Sharday's phone number was in his cell phone, but the Defendant asserted that Inv. Joy "was going through [his] phone while he was talking to [the Defendant]."

The jury convicted the Defendant as charged, with two counts of aggravated kidnapping and two counts of aggravated robbery. This timely appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant first contends that the evidence was insufficient to establish his identity as one of the perpetrators of the robbery and kidnapping at the Hills' home. He further asserts that there is "insufficient evidence that an aggravated robbery or aggravated kidnapping was committed." He offers no further argument in support of these contentions. The State responds that the evidence was sufficient to support the Defendant's convictions for aggravated robbery and aggravated kidnapping.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657, S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out

every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971) (quotation marks omitted).[4]

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . ." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant to this appeal, aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" when "[a]ccomplished with a deadly weapon." Tenn. Code Ann. §§ 39-13-401, -402. Theft of property occurs when a person, with intent to deprive the owner of property, . . . knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Aggravated kidnapping is false imprisonment committed "[w]hile the defendant is in possession of a deadly weapon . . . ." Tenn. Code Ann. § 39-13-304. False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302. Furthermore, the identity of the perpetrator "is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006).

---

[4] In his brief, the Defendant cites to the standard from Crawford despite it having been expressly overruled by our supreme court over four years ago and this court's repeated warnings that Crawford "is no longer representative of the current state of the law in Tennessee." State v. Deborah Davis, No. E2011-01519-CCA-R3-CD, 2012 WL 6727512, at *11 (Tenn. Crim. App. Dec. 27, 2012), perm. app. denied (Tenn. May 8, 2013).

The perpetrator's identity "may be established solely on the basis of circumstantial evidence." State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010).

In the light most favorable to the State, the evidence produced at trial showed that two men arrived at the Hills' home on October 7, 2007, and forced the Hills into their home at gunpoint. Each assailant was carrying a gun, and the men asked the Hills where their safe was located and threatened to kill them. After taking money out of the safe, the Defendant led the Hills into the master bathroom and held them at gunpoint while the second assailant continued to search the home for items of value. In total, approximately $4,000, including $2 bills, and several guns were taken from the home.

Mr. Beauregard testified that the Defendant participated in the home invasion. Likewise, both Hills testified unequivocally that the Defendant was one of their assailants and explained that they were unable to identify him initially because of the poor quality of the picture included in the photo array. When the Defendant was arrested, he had over $900 in his car, including several $2-bills. Also, a dark hoodie matching the description of one worn by the intruders was recovered from the Defendant's girlfriend's apartment. The Defendant admitted owning a 9 millimeter handgun, although he claimed to have sold it around the time of the robbery. When questioned by Inv. Joy about where he got the $2-bills, the Defendant responded inconsistently, stating at one point that he got them from his grandmother, and at another point that he got them from Mr. Beauregard. Based on this evidence, we conclude that there was sufficient evidence to support the Defendant's convictions for aggravated robbery and aggravated kidnapping, and the Defendant is not entitled to relief on this issue.

## II. Voir Dire

The Defendant next contends that the jury pool was tainted when one potential juror alluded to the Defendant's previous trial during voir dire. In particular, the Defendant asserts that his "due process and equal protection" rights were violated when the potential juror informed the entire venire that the Defendant's case had been tried before. The State responds that the trial court did not err in denying the Defendant's motion for mistrial because the potential juror did not use the word "trial," and she was immediately excused from the jury pool, thus, no manifest necessity to grant a mistrial existed.

During voir dire, the prosecutor stated that the events underlying the trial had happened in October 2007 and that there had been newspaper coverage at that time. The prosecutor asked whether anyone remembered hearing about the events back in 2007. One of the potential jurors responded that she did have prior knowledge of the events. The following exchange took place:

[Potential Juror]: I was called in on jury duty. I didn't serve but I was called in.

[Prosecutor]: On jury duty back then. And –

[Defense Counsel]: Your Honor –

[Prosecutor]: -- you were present in the jury pool when this case came up; is that correct?

[Potential Juror]: Right.

[Prosecutor]: Okay. Can you hang on just a second because I've got a feeling I need to go talk to the Judge for just a second.

A bench conference was held, and defense counsel requested a mistrial "based on [the potential juror's] mention there had been a previous trial." In response, the prosecutor noted that the jury was going to hear that there had been some kind of previous hearing on the matter because Mr. Hill's testimony from the first trial was going to be read into evidence. The trial court agreed and denied the request for a mistrial. The potential juror was then excused from jury service.

The decision whether to grant a mistrial is an issue entrusted to the trial court's sound discretion. See State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Gilley, 297 S.W.3d 739, 764 (Tenn. Crim. App. 2008) (quoting State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). Accordingly, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. Banks, 271 S.W.3d 90, 137 (Tenn. 2008) (citing State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004)). The burden of establishing the necessity for mistrial lies with the party seeking it. Id. (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict. Id.

On appeal, this court will disturb a trial court's denial of a motion for mistrial only when there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990); Williams, 929 S.W.2d at 388 (Tenn. Crim. App. 1996). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." State v.

-14-

Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)); see also State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). In reviewing for an abuse of discretion, this court has held that the following three factors should be considered: (1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof. See State v. Lawrence Taylor, No.W2002-00183-CCA-R3-CD, 2003 WL 402276, at *10 (Tenn. Crim. App. Feb. 14, 2003).

"A reference to a previous trial does not necessarily constitute 'manifest necessity' for the purposes of a mistrial." State v. Brice Cook, No. W2012-00406-CCA-R3-CD, 2013 WL 9570493, at *14 (Tenn. Crim. App. Sept. 4, 2013). For example, this court has previously held that a mistrial was not warranted where a witness referenced a video "at the first trial," State v. Quinton Sanders, No. W2006-00760-CCA-R3-CD, 2009 WL 1424188, at *11 (Tenn. Crim. App. May 20, 2009), where a prosecutor inadvertently referred to the prior trial as a "trial" rather than a "hearing," State v. Willie Claybrook, No. 3, 1992 WL 17546, at *13 (Tenn. Crim. App. Feb 5, 1992), or where a witness twice referred to reviewing evidence at "the last trial," Cook, 2013 WL 9570493, at *6, *14. Accordingly, we consider the potential juror's comment in this case to be relatively insignificant. In the present case, the potential juror did not specifically refer to the Defendant's previous "trial." Rather, she merely mentioned that she had "been called before" to serve on the Defendant's jury. Although this answer was in response to the prosecutor's inquiry about previous knowledge of the case, the prosecutor's question merely aimed to elicit information about whether potential jurors had been exposed to news coverage at the time that the robbery occurred. No curative instruction was requested by the Defendant or provided by the court, but the comment occurred during voir dire, and the potential juror was immediately excused from jury service.

Contrary to the Defendant's assertion, the comment did not inform the entire venire that the potential juror had "served on jury duty when this case was tried before." Additionally, and importantly, the comment did not intimate that the Defendant had actually been convicted of the relevant charges. The jury that served at the Defendant's trial was aware that there had been previous proceedings, referred to as "hearings," in the case. Furthermore, the State's case against the Defendant was strong. Accordingly, we cannot conclude that this statement created a manifest necessity requiring the granting of a mistrial, and the Defendant is not entitled to relief on this issue.

### III. Juror Misconduct

The Defendant next contends that "jury misconduct irretrievably tainted the trial when the foreman of the jury made comments" about the Defendant's guilt prior to the jury being charged and allowed to deliberate. In response, the State asserts that the jury

-15-

foreman's comment "does not constitute the type of internal influence" that warrants a new trial.

At the hearing on the motion for new trial, the Defendant told the trial court that it had learned that one of the jurors told the rest of the panel that he was willing to be foreman and that he knew the Defendant was guilty. The Defendant asserted that this statement occurred "during one of the breaks before the jury was charged and allowed to deliberate." The Defendant called one of the alternate jurors, who was present when the statement was made, to testify at the hearing.

The alternate juror testified that, prior to being excused from the jury panel, she was privy to a conversation between the eventual foreman of the jury and other members of the jury panel. According to the alternate juror, the foreman stated that "he knew [the Defendant] was guilty and [that] he would take the position for the foreman because he knew [that] he was guilty . . . ." She testified that this statement occurred during one of the breaks, although it is not otherwise apparent at what point in the trial the comment was made. The alternate juror testified that the other jurors "were happy because they was [sic] like good, we ain't got to worry about it, you know. I mean, they were just – they were happy that he had spoke [sic] up and said he wanted to be the foreman."

Tennessee Rule of Evidence 606(b) provides that during an inquiry into the validity of a verdict,

> a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

This court has previously held that post-verdict inquiries into whether a jury has prematurely deliberated are barred because premature deliberations do not involve extraneous prejudicial information or outside influence. State v. Frazier, 683 S.W.2d 346, 353 (Tenn. Crim. App. 1984); see also State v. Aldret, 509 S.E.2d 811, 814 n.5 (S.C. 1999) (citing Frazier for the proposition that Tennessee courts "disallow any inquiry into allegations of premature deliberations since such allegations do not involve an extraneous

influence over the jury"). The Defendant's issue with regard to the jury foreman's statement that he "knew the Defendant was guilty" is analogous to a claim that the foreman prematurely deliberated about the case. As such, the Defendant's inquiry into whether the jury deliberated prematurely was barred by Rule 606(b).

However, even considering the alternate juror's testimony at the motion for new trial, the alternate testified that there was no response or discussion with regard to the foreman's statement on the Defendant's guilt. Rather, the other jurors were mostly focused on the juror's offer to assume the role of foreman. Therefore, we conclude that this issue is without merit.

## IV. Allocution

The Defendant next asserts that the trial court committed reversible error when it allowed the prosecutor to impeach him with a statement he made during allocution at his first trial. In particular, the Defendant avers that allowing "a defendant's statements from a sentencing hearing allocution . . . would in [e]ffect limit his or her right to an allocution in the State of Tennessee." The State responds that the Defendant's voluntary statement from his prior allocution was properly admitted as a prior inconsistent statement after the Defendant elected to testify on his own behalf and denied any involvement in the home invasion.

The following exchange took place during cross-examination of the Defendant:

[Prosecutor]: One last question, if you had nothing to do with the robbery of the Hills, why did you apologize to them for whatever trouble you caused?

[The Defendant]: I apologized for what happened to them.

[Prosecutor]: "I want to apologize to the Hills for whatever trouble I have caused to you all. I truly, truly am sorry." If you did nothing, why did you give that apology?

[The Defendant]: Because I apologized for what happened to them.

[Prosecutor]: Let me rephrase – Let me restate that. "I want to apologize to the Hills for whatever trouble I have caused to you all. I truly, truly am sorry."

-17-

At this point, defense counsel asked to approach the bench. Defense counsel moved for a mistrial, arguing that the prosecutor had elicited testimony given during the sentencing phase of the Defendant's first trial. The following exchange followed:

> [Defense Counsel]: I move for a mistrial. That elicits that testimony [sic] has come from a previous trial at a sentencing phase.
>
> [Prosecutor]: No it doesn't.
>
> [Defense Counsel]: Yes, it does.
>
> [Trial Court]: He didn't reference where it came from. I didn't hear him say there was a prior trial.
>
> [Prosecutor]: He put his client on the stand. These were statements he made.
>
> [Trial Court]: If he were to allude to [the previous trial], that could raise a mistrial but he just asked for a response to the question.
>
> [Defense Counsel]: But the only way to rehabilitate that is to mention a previous trial, that it was at a sentencing hearing and that at that point he had been determined guilty.
>
> [Trial Court]: If you're asking for a mistrial, that is declined.

The bench conference concluded, and the prosecutor asked the Defendant whether he had read the Defendant's previous statement correctly. The Defendant agreed that he had.

Following the close of proof, defense counsel renewed his motion for a mistrial "based upon that question regarding the statement that [the Defendant] made at a sentencing hearing." Defense counsel asserted that it was problematic because the Defendant was not subject to cross-examination and because he had already been found guilty at the time he made the statement. The prosecutor responded that he "believe[d] [the statement] was subject to cross-examination" and that "[w]hen [the Defendant] got on the stand he opened himself up to be questioned about any prior statements that he had made." The court denied the motion for mistrial.

The Defendant again raised the issue in his motion for new trial, and at the hearing on the motion, defense counsel asserted that the statements from the Defendant's allocution at the previous trial should not have been admitted "because at the time of the

-18-

allocution, [the Defendant's] presumption of innocence had been removed." Defense counsel continued, arguing that "if allocutions are allowed to be admitted in new trials when new trials are granted, then basically a person would really not have a right to allocution because they would always fear that that [sic] statement could be used against them later if a new trial is granted." Counsel argued that allowing for such a circumstance would infringe upon the "absolute right to allocution" recognized in this state. In response to a question from the trial court, counsel clarified that the Defendant was not subject to cross-examination when he made the statement.

In response, the prosecutor argued that the statement was admissible as a prior inconsistent statement. The prosecutor pointed out that the Defendant testified that he was not involved in the robbery of the Hills' home and that his apology made during allocution was inconsistent with that testimony. The prosecutor concluded that, because he never mentioned that the prior inconsistent statement came from the previous trial or sentencing hearing, introduction of the statement did not prejudice the Defendant.

After argument, the trial court denied the motion for new trial. With respect to the introduction of the statement, the trial court said that it "st[ood] by its previous ruling" that it was allowed in as an inconsistent statement.

Allocution has been defined as "the formality of the court's inquiry of a convicted defendant as to whether he has any legal cause to show why judgment should not be pronounced against him on the verdict of conviction." State v. Stephenson, 878 S.W.2d 530, 550 (Tenn. 1994) (citation omitted). It is "an unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. This statement is not subject to cross-examination." Black's Law Dictionary 75 (7th ed. 1999); see also United States v. Gilbert, 244 F.3d 888, 924 (11th Cir. 2001). Defendants do have a statutory right to allocution in non-capital cases. Tenn. Code Ann. § 40-35-210(b)(6); see also State v. Keathly, 145 S.W.3d 123 (Tenn. Crim. App. 2003). However, whether a statement given in allocution can be used in a subsequent trial against a defendant on the same charges is an issue of apparent first impression in Tennessee.

In support of his position, the Defendant points us to a decision from the Utah Supreme Court, wherein that court held that, upon retrial, the prosecution could not use a defendant's statement given in allocution at his first trial in its case-in-chief. State v. Maestas, 63 P.3d 621, 626 (Utah 2002). In Maestas, the court set forth the "dilemma" involved in resolving the issue:

> Why should a defendant be able to seek the benefits of a confession at allocution, but avoid the costs at retrial? On the other hand, should the exercise of the right to plead for mercy deprive a defendant who has been unlawfully convicted of a clean slate at his or her retrial?

63 P.3d at 633. Ultimately, the court determined that it was "fundamentally unfair to burden the right to plead for leniency at allocution with an automatic waiver of the right, on retrial, to require the state to prove guilt without the use of the contents of those pleadings." Id. (footnote omitted).

In response, the State points us to State v. Harvey, 835 P.2d 1074 (Wyo. 1992). In Harvey, the prosecutor introduced portions of the Defendant's inculpatory allocution statement in its case-in-chief. Id. at 1082. On appeal, the defendant argued that the introduction of his allocution statement into evidence upon retrial violated his right against self-incrimination. Id. at 1081. A majority of the court held that, like the comparable right to testify on one's own behalf, "[a] defendant's [allocution] statements may be admissible against him in future proceedings, provided they are voluntary." Id. at 1082-83.

We note that the case before us is distinguishable from the cases cited by both the Defendant and the State. Harvey is distinguishable because, in that case, the defendant argued that the use of the allocution statement impeded his right against self-incrimination. 835 P.2d at 1081. Here, the Defendant's argument is not specifically constitutional, and he does not protest that exercising his right to allocution forced him to surrender a countervailing constitutional right. Also, in Maestas, the court held that the prosecution could not introduce the defendant's allocution statement in its case-in-chief, but, importantly, the court made clear that "[i]f the defendant testifie[d] at retrial . . . he [could] be impeached by the use of statements made at the allocution." Maestas, 63 P.3d at 633 n.9. We find this latter distinction critical to the issue at hand.

Were this a case where the prosecution sought to introduce the Defendant's statement from his previous trial in its case-in-chief, the outcome, and certainly our analysis, might be very different. The Defendant asserts that allowing the use of a statement given in allocution upon retrial provides the State with an unfair advantage and results in a defendant not being placed in the same position he was in at the time of the first trial. However, the perils attendant to a defendant's decision to testify on his own behalf are well-established, and the Defendant has proffered no compelling reason to treat a defendant's statement made in allocution differently than any other prior statement which may become relevant for impeachment purposes. Cf. Harris v. New York, 401 U.S. 222, 225-226 (1971) (holding that a defendant's statement to police, which was

-20-

rendered inadmissible based on failure to provide the defendant with <u>Miranda</u>[5] warnings, was admissible for impeachment purposes on cross-examination); <u>see also</u> <u>State v. George S. Mason</u>, No. 01C01-9509-CC-00288, 1997 WL 211245, at *8, 9 (Tenn. Crim. App. Apr. 30, 1997) (citing <u>Harris</u> and holding that previously suppressed evidence was admissible to impeach a testifying defendant on cross-examination). We cannot agree that it is inherently unfair to require a defendant to consider all of his previous statements, even those made during allocution at a previous trial, before deciding to testify on his own behalf.

Furthermore, defense counsel's initial fear—that the only way to rehabilitate the Defendant would be to divulge that the prior statement came from the sentencing hearing at the previous trial—was not realized. On redirect examination, defense counsel was able to rehabilitate the Defendant by allowing him to explain his motivation for apologizing to the Hills, which was that he was sorry for what happened to them but that he was not personally responsible. Defense counsel accomplished this without mention of the previous trial or sentencing hearing. It is also worth noting that the statement used to impeach the Defendant was far from a direct admission of guilt, but rather, was a relatively innocuous statement of apology that, again, he was able to explain during redirect examination. The weight to be given to this alleged inconsistency is a matter reserved to the trier of fact. <u>See</u> <u>Bland</u>, 958 S.W.2d at 659.

We emphasize that this is not a case where the prosecution sought to introduce the Defendant's allocution statement in its case-in-chief as proof of the Defendant's guilt. Rather, the State attempted to undermine the Defendant's credibility through impeachment, and the jury was properly instructed that a prior inconsistent statement should be used only to test the credibility of the witness, not as substantive proof of guilt. Defendants who choose to testify on their own behalf are always tasked with a difficult decision—the imperative to tell one's side of the story must be balanced with the reality that vigorous cross-examination by the State might undermine a defendant's credibility. And, as with any witness, the right to use a prior inconsistent statement to impeach the credibility of a testifying defendant is fundamental to the truth-seeking goal of trials. Accordingly, we conclude that the trial court did not err by allowing admission of the allocution statement for impeachment purposes after the Defendant elected to testify on his own behalf. The Defendant's argument in this respect is without merit.

---

[5] <u>Miranda v. Arizona</u>, 864 U.S. 436 (1966).

## CONCLUSION

Based on the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE